# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No.: 21-cv-2715

**ANDREW GLENN HUFF, an individual,**

　　　Plaintiff,

v.

**THE CITY OF AURORA, COLORADO;**
**OFFICER ALEXANDER ORD, in his individual capacity,**

　　　Defendants.

---

## COMPLAINT AND JURY DEMAND

---

　　　Plaintiff, Andrew Glenn Huff, by and through counsel, Baumgartner Law, L.L.C., and Beem & Isley, P.C., respectfully submits this Complaint against the Defendants and alleges the following:

### JURISDICTION AND VENUE

1.　　This action is brought pursuant to 42 USC §1983, §1988, and the Fourth Amendment to the United States Constitution.　Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.　　Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391(b) because the Defendants include a governmental entity in Colorado and a citizen and resident of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

### PARTIES

3.　　Plaintiff, Andrew Glenn Huff, is and was at all relevant times a citizen of the State

of Colorado, residing in Arapahoe County, Colorado.

4.      Defendant, City of Aurora (the "City" or "Aurora"), is a municipal corporation and/or governmental entity in the State of Colorado with final policy-making authority over the Aurora Police Department ("APD") and its police officers.

5.      Defendant, Officer Alexander Ord ("Officer Ord"), is and was at all times relevant a citizen of the State of Colorado, employed by the APD as a police officer, and acting under color of state law and within the course and scope of his agency or employment with and/or the authorization of the APD.

## GENERAL ALLEGATIONS

### A.      Background Facts Central to Plaintiff Andrew Huff's Claims and Injuries

6.      On October 10, 2019, Plaintiff lived in a house located at 1570 South Bahama Street, Aurora, Colorado ("Plaintiff's Home"), with his wife, his three-year-old daughter, and his brother, George Huff.

7.      Prior to October 10, 2019, Plaintiff and George Huff (collectively the "Huff brothers") allowed George Bejar-Gutierrez to reside with them at Plaintiff's Home.

8.      On October 10, 2019, Mr. Bejar-Gutierrez stole George Huff's motor vehicle to drive to a methadone clinic.

9.      Mr. Bejar-Gutierrez, while under the influence of methadone, eventually returned to Plaintiff's Home the same day with George Huff's vehicle. Plaintiff and George Huff immediately saw that the car had been damaged by Mr. Bejar-Gutierrez.

10.     When Mr. Bejar-Gutierrez exited the vehicle, he initiated a physical confrontation with the Huff brothers.  A passerby observed the confrontation and called 911.

11.     Mr. Bejar-Gutierrez fled the premises before police arrived in response to the 911 call.

12.     Aurora Police Officers Doorgeest, VanDyk, and Vaughan were dispatched to Plaintiff's Home in response to the 911 call.

13.     When the officers arrived, the Huff brothers remained on scene and cooperated fully with the officers' investigation, explaining to the officers what happened with Mr. Bejar-Gutierrez.

14.     The officers did not arrest or charge Plaintiff or his brother with any crime.  In fact, they informed the Huff brothers that neither would be charged with any crime.

15.     At the end of the interaction with the Aurora police officers, Plaintiff volunteered his cell phone number, which the officers accepted, and he told the officers that he would be available at their request for any future communications.

16.     Throughout the day and into the evening, Mr. Bejar-Gutierrez communicated multiple threats to the Huff brothers.

17.     One such threat was that Mr. Bejar-Gutierrez would return to Plaintiff's Home that day, even though he had been told he was no longer allowed on the property due to stealing George Huff's vehicle and assaulting the brothers.

18.     Both Plaintiff and George Huff feared that Mr. Bejar-Gutierrez would return to the house and attempt to assault them or their family, including Plaintiff's wife and three-year-old daughter.

19.     Upon information and belief, Mr. Bejar-Gutierrez made his own call to Aurora Police at some time that evening. At approximately 7:00 p.m., Aurora Police Officers Alexander Ord, Erica Marrero, and Jason Oviatt, responded to 1603 South Flanders Way in Aurora to take a

report from Mr. Bejar-Gutierrez.

20.    George Bejar-Gutierrez claimed that the Huff brothers had assaulted him earlier in the day and claimed that Plaintiff had a firearm.

21.    Despite the fact that Mr. Bejar-Gutierrez was a convicted felon who had previously been arrested for giving false information to an Aurora police officer, and despite the fact that Plaintiff has no criminal record other than traffic infractions, the Aurora police officers did no further investigation into his allegations and took Mr. Bejar-Gutierrez at his word.

22.    Officers Ord, Marrero, and Oviatt did not call Mr. Huff at the phone number he had previously provided to Officers Doorgeest, VanDyk, and Vaughan during the earlier encounter and investigation.

23.    Instead, Officers Ord, Marrero, and Oviatt inexplicably decided to travel to Plaintiff's home at 11:30 p.m. without any advance notice to Plaintiff, to initiate an in-person interview or arrest.

24.    Instead of parking in front of Plaintiff's Home with easily identifiable and clearly marked police vehicles, the officers intentionally parked around the corner and out of sight from Plaintiff's Home.

25.    Dressed in all black, the Aurora police officers, including Officer Ord, covertly approached the house under the cover of darkness, even creeping through neighboring yards to avoid being seen in the street.

26.    At the time the officers started approaching Plaintiff's Home, Plaintiff was smoking outside by his truck when he saw several people dressed in dark clothing creeping towards his house and through the neighbor's yard.

27.    Because the officers did not identify themselves as they approached and because

the previous Aurora officers told Plaintiff they would call him with any further questions, Plaintiff had no idea, much less any reason to believe, they were police officers.

28.     Rather, Plaintiff reasonably believed that Mr. Bejar-Gutierrez had returned to his house with other people in order to carry out his earlier threats against Plaintiff and his family.

29.     Fearing an attack by Mr. Bejar-Gutierrez, Plaintiff ran inside his home to protect himself and his family.

30.     Despite seeing Plaintiff at his truck and his reaction, the approaching officers, including Officer Ord, still failed to identify themselves in any way.

31.     Instead, Officer Ord and the other officers continued to silently approach Plaintiff's Home, which had its interior lights on, and took up positions surrounding the front of the house— dressed all in black, in the middle of the night, whispering, moving as silently as possible, and hiding behind vehicles in Plaintiff's driveway. In all respects, the officers were as covert as possible.

32.     In order to protect himself from what he reasonably believed to be an imminent home invasion and attack on himself and his family, Mr. Huff retrieved a shotgun that he kept in his bedroom and came back downstairs to the front living room.

33.     As Plaintiff was returning to the living room, Officer Marrero knocked on Plaintiff's front door. Still, no officer made any attempt to identify themselves in any way.

34.     Rather than just opening the door, Plaintiff first looked through his living room window with the shotgun pointed at the ceiling.

35.     As he did this, Officer Ord, who was now standing in Plaintiff's front yard, concealed by the darkness and dark clothing, and who also made no effort at any time to identify himself, drew his weapon and yelled, "Hands up! Gun!"

36.     At this moment, Plaintiff realized that an unidentified person was in his front yard, and he started to drop to the floor and away from the window.

37.     As Plaintiff was moving away from the window, Officer Ord fired five gunshots at the Plaintiff through the living room window.

38.     By shooting Plaintiff at virtually the same time that he shouted, "hands up," he gave Plaintiff no opportunity to understand that this command was coming from a police officer, much less no opportunity to comply with the order.

39.     Plaintiff was shot in the back side. One of the rounds passed through Plaintiff's rectum and became lodged in his pelvis. Another round traveled through the house, coming to rest in the bedroom in which Plaintiff's three-year-old daughter was sleeping at the time.

40.     As a result of being shot by Officer Ord, Plaintiff had to be immediately transported to Aurora Medical Center for emergency lifesaving medical care.

41.     Plaintiff never pointed the shotgun at anyone, nor did he make any threatening movements or verbal threats of any kind. Indeed, because the officers were outside of his house, dressed in black, and under the cover of darkness, he could not identify them from the lighted interior of his living room. When Plaintiff realized that an unidentified person was in his front yard, his movements were clearly defensive and could not be construed as threatening.

42.     Moreover, Mr. Huff did not leave or attempt to leave the house, nor did he open any door or window of the house. In fact, the window through which he was shot was sealed and could not be opened.

43.     Although no officer was ever in any danger,   Officer Ord unreasonably and recklessly created a dangerous situation by, among other things, failing to fully and properly do an internal investigation of the accusations by Mr. Bejar-Gutierrez, which would have revealed

Plaintiff's statement obtained by the earlier investigating APD officers and his willingness to cooperate; failing to contact Plaintiff ahead of time to see if he would voluntarily speak to the officers about the accusations; failing to identify himself and the others as police officers and issue proper commands so that Plaintiff could understand who they were and what was happening; failing to give Plaintiff an opportunity to comply with commands before Officer Ord shot him, and failing to use any other de-escalation tactics first in an effort to defuse or prevent the situation from becoming dangerous.

44.     Because Plaintiff had previously cooperated with the Aurora police, given the prior officers his phone number and thus exhibited a willingness to continue cooperating with them, and been told that he was not being charged with any crime, there was never any reason to believe that Plaintiff would have been hostile toward police officers as long as he knew that he was dealing with the police.

45.     Instead of acknowledging these grievous failures and errors, Officer Ord and his fellow officers arrested Plaintiff and charged him with multiple felonies related to Mr. Bejar-Gutierrez's accusations in an attempt to justify their unconstitutional and illegal use of excessive force.

46.     After the unconstitutional shooting of Plaintiff, the Aurora Chief of Police at the time Paul O'Keefe, publicly stated that Officer Ord's actions were in conformity with Aurora policy and custom.

47.     All charges against Plaintiff were unconditionally dismissed.

48.     As a result of being shot by Officer Ord, Plaintiff has suffered severe, permanent, life-altering injuries and damages, including without limitation permanent physical injuries and related complications, permanent physical impairment and/or disfigurement, severe emotional

distress, ongoing pain and suffering, mental anguish, loss of consortium, post-traumatic stress, anxiety, and a significant loss of quality of life.

     **B.**     <u>**Background Facts Related to the City's Municipal Liability**</u>

     49.     In August 2021, a private, independent consulting firm, 21CP Solutions, released a report titled "Recommendations for the Aurora Police Department" (hereafter "Independent Report".) This report was commissioned by the City of Aurora to evaluate and make recommendations regarding the APD's use of force.

     50.     Plaintiff incorporates herein the findings in the Independent Report, which was introduced as part of the City of Aurora Council Agenda Commentary on August 16, 2021. A copy of the Independent Report is attached hereto as Exhibit 1.

     51.     The Independent Report concluded that the APD provides virtually zero training on de-escalation and does not provide adequate guidance or training to officers on the legal and constitutional parameters of use of force, specifically including training on the "core concept of proportionality." The report concluded that APD's written policy on the use of force was constitutionally inadequate. Specifically, APD's written use-of-force policy entirely fails to enunciate or provide any guidance at all on the requirement that such force be *objectively* reasonable.

     52.     The following are non-exhaustive examples of critical flaws in the APD's policy and training on the use of force that were highlighted in the 21CP Report:

     a.    Recommendation 1 states, "APD needs to revise its core use of force policies along a number of critical dimensions.  Ultimately, APD policy should expressly provide that officers may use force only when necessary, proportional, and objectively reasonable, to the nature of a subject's threat, and after de-escalation tactics and strategies have

been attempted and failed, or are not feasible under the given circumstances."

b. Recommendation 1.8 states, "APD's use of force policy should authorize force only when it is proportional to the nature of the threat that a subject poses under the circumstances."

c. Recommendation 1.5 states, "APD should refine and expand its treatment of de-escalation in its core force policy—more directly emphasizing that de-escalation is an affirmative duty of all officers in all circumstances."

d. Recommendation 2 states, "Critically, 21CP had difficulty identifying training manuals—whether for new ADP officers in the academy or current officers for in-service training—specifically addressing de-escalation.  Although content covered in a two-hour class on 'special populations' and an 8-hour instructional block on verbal defense and influence appeared to cover at least some concepts related to de-escalation, de-escalation did not seem regularly, squarely addressed as a core concept of APD training in years between 2015 and 2019."

53.     Thus, as of October 10, 2019, APD's use-of-force policy allowed its officers to use the amount of force they subjectively felt was warranted, unconstrained by any objective or proportionality standards, and without any requirement that de-escalation attempts be made.

54.     "On September 15, 2021, The Office of the Attorney General of the State of Colorado released a 118-page report entitled, "Investigation of the Aurora Police Department and the Aurora Fire Recue" (hereafter "AG's Report"), which is incorporated by reference herein as Exhibit 2.

55.     The central finding of the report is that "Aurora Police has a pattern and practice of using excessive force." AG's Report p. 1. "We found that Aurora Police has repeatedly engaged

in unlawful and unconstitutional uses of force, regularly applying greater force than reasonably warranted by the situation. *Id.*

56.     The AG's Report concluded that the primary cause of APD's pattern and practice of use of excessive force is that it has a culture that emphasizes justification for force rather than whether force was lawful and appropriate.

57.     The AG's Report found that the second cause for the pattern and practice of use of excessive force is that APD's use of force policy and its implementation (the policy as applied) focuses on the maximum force permitted under the law.

58.     The AG's Report further found that the APD's pattern and practice of use of excessive force was caused by both a lack of meaningful training on de-escalation, and a fundamental misunderstanding of the concept of de-escalation: "Aurora Police often views de-escalation as what happens after force is used, rather than an alternative to using force in the first place. Repeatedly, during Force Review Board Meetings, members applauded de-escalation that occurred after officers had tased or tackled someone, rather than focusing on whether the taser or tackle was necessary in the first instance. De-escalation, properly understood, focuses on tactics that reduce the need for force in the first place, rather than decreasing the amount of force used after the fact." AG's Report, p. 83.

59.     As of October 10, 2019, the APD not only failed to train its officers on de-escalation tactics, but it also failed to properly train its police officers to use proportionate force appropriate for the circumstances.  Instead, it fostered and encouraged a "force first" mentality with its police officers.

60.     Instead of acknowledging and correcting unconstitutional uses of force through appropriate training and discipline, the APD consistently engaged in a practice of justifying its use

of force, either through the Force Review Board or through public statements of support by policy makers after high-profile violent incidents.

61.     The APD's flaws in policy, training, and discipline, coupled with its justification after-the-fact, that promote the practice of unconstitutional use of force is exemplified by the shooting of decorated war veteran Richard Gary Black in his Aurora home on July 30, 2018.  Mr. Black was defending his family against an intruder when APD officers shot and killed him while he stood in his living room. Like Plaintiff, Mr. Black never aimed his gun at the officers and never posed a threat to officers other than simply standing in his home exercising his Second Amendment right to protect his home and family during an emergency.

62.     Despite this clearly unconstitutional killing, the Aurora Chief of Police at the time, Nick Metz, told the press that the APD officer who killed Mr. Black was acting in conformity with APD policy and custom.

63.     By making these public statements, Chief Metz ratified that shooting (as well as any subsequent similar shootings) as an accepted practice for APD officers.

64.     As of October 10, 2019, the APD failed to properly train police officers to interact with citizens exercising their Second Amendment right to bear arms in their homes for protection. Specifically, the APD failed to properly train police officers to use de-escalation tactics and strategies to reduce the risk level of a dangerous encounter of this type and thus avoid the use of excessive force. This situation is certain to arise on a regular basis when police respond to emergencies at citizens' homes. Despite the obvious need for this training, and the clear likelihood that police will violate the constitutional rights of citizens without the training, Aurora has prioritized the exoneration of officers above all other considerations. In short, the City has been deliberately indifferent to the need and likelihood that their officers will continue to shoot residents

merely for exercising Second Amendment rights in their homes when officers respond.

65.     On the night of October 10, 2019, Officer Ord acted in conformity with the APD's flawed and inadequate policy, his lack of training, and the pervasive and widespread culture within the APD of using excessive force as a primary method of interacting with members of the Aurora community.

## CLAIMS FOR RELIEF
## CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

66.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

67.     The Fourth Amendment of the U.S. Constitution prohibits unreasonable or excessive use of force in connection with searches and seizures. While detaining, restraining and/or arresting a person, the Fourth Amendment protections only allow police officers and deputies to use the amount of force that is objectively reasonably necessary and proportionate to the danger presented under the circumstances.

68.     A municipality may be liable under §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

## FIRST CLAIM FOR RELIEF
### Violation of the Fourth Amendment of the United States Constitution
### Unnecessary, Unreasonable, and Excessive Force
### (Against Defendant Officer Ord in His Individual Capacity)

69.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

70.     A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs

when an officer intentionally applies physical force to the body of person to restrain his or her freedom to simply walk away.  *See, e.g., Torres v. Madrid*, 141 S.Ct. 989, 993 (2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Furthermore, the high-level use of force of an officer pointing a gun at a person constitutes a seizure as a matter law.  *See Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018). Without question, a seizure occurs when an officer unholsters his firearm, points and shoots an individual who was merely invoking the Second Amendment right to defend his or her home and family.  In this matter, Plaintiff was seized when he was intentionally shot through the window of his living room by Officer Ord.

71.     It is clearly established in this circuit that an officer may not employ deadly force against a person who poses no threat.  *See Huff v. Reeves*, 996 F.3d 1082, 1090 (10th Cir. 2021) (discussing cases).

72.     Considerations bearing on the threat posed by a suspect, a factor in assessing the reasonableness of the force applied against him, include the following: (1) whether officers ordered the suspect to drop his weapon, and whether the suspect complied; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.  *Estate of Larsen, ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008).

73.     The excessive force inquiry includes not only the officers' actions at the moment the threat was presented, but also may include their prior actions that unreasonably created the danger, thus precipitating the need for such force. *See Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699 (10th Cir.1995).

74.     In this instance, at no point prior to the seizure did any APD officer try to contact Plaintiff to see if he would voluntarily speak with them.  Furthermore, at no point during the seizure

and use of excessive force did any officer, including Officer Ord, ever identify themselves as law enforcement, despite multiple opportunities to do so, before Officer Ord fired multiple gunshots at Plaintiff to affect a seizure.

75.      Although Officer Ord yelled, "Put your hands up! Gun!" he did so immediately before, if not at the same moment, he shot Plaintiff from a concealed and protected position outside Plaintiff's Home. Therefore, Plaintiff had no opportunity to comply with commands before being shot.

76.      Plaintiff made no hostile movements toward any of the officers and the shotgun was pointed at the ceiling at all times while Plaintiff was inside a closed house, and the officers were safely outside. Plaintiff made no threats, and none of his actions while standing inside his illuminated home could be construed as threatening.

77.      Plaintiff was inside his home, which was illuminated from the inside, and separated from the officers by a closed door and a sealed window through which he could not see the officers. Because it was dark outside and because the officers had not identified themselves, Plaintiff had no idea that the persons on his property were police officers.

78.      By pointing the shotgun at the ceiling, Plaintiff displayed, at most, only a non-threatening ability to protect his home and family, if necessary, from a convicted felon who had recently attacked him and had been threatening him throughout the day.

79.      At no point did any officer attempt to use anything less than lethal force during the encounter with Plaintiff.

80.      Furthermore, it was Officer Ord's unreasonable and reckless actions taken in conjunction with his fellow officers that created any perceived threat to his or the other officers' safety. Officer Ord made no attempt to de-escalate this encounter.  Parking out of the line of sight,

14

approaching the house dressed in black under the cover of darkness, failing to identify themselves as law enforcement despite having multiple opportunities to do so, and the circumstances of the shooting itself show that Officer Ord unreasonably and recklessly escalated and/or contributed to the escalation of the encounter at every given opportunity.

81.     The constitutional violation in this case is so plainly excessive that no analogous cases need be referenced. *See Huff*, 996 F.3d at 1090; *accord Weinman v. McClone,* 787 F.3d 444 (7th Cir. 2015) (holding that kicking down a door and shooting a person passively holding a shotgun in his home is so plainly excessive that no analogous cases need be cited). Similarly, in this instance, Officer Ord crept through Plaintiff's neighborhood and into his front lawn in the dead of night without identifying himself as a police officer and then shot Plaintiff when he looked out the window and without giving him an opportunity to comply with his commands.

82.     Even though Officer Ord's actions are so clearly unconstitutional as to need no analogous cases, case law from the Tenth Circuit and the weight of authority from other circuits put the issue beyond debate. *See Pauly v. White*, 874 F.3d 1197, 1215-22 (10th Cir. 2017) (finding that officer who shot through an open window and killed a man who was defending his home from a perceived home invasion violated the man's constitutional right to be free from excessive force); *see also Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997); *Lopez v. Gelhaus* 871 F.3d 998 (9th Cir. 2017); *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015); *Cole v. Carson*, 935 F.3d 444, (5th Cir. 2019).

83.     As a result of being shot by Officer Ord, Plaintiff has suffered severe and permanent injuries, emotional distress, ongoing pain and suffering, mental anguish, loss of consortium, post-traumatic stress, anxiety, and a significant loss of quality of life as previously alleged.

**SECOND CLAIM FOR RELIEF**
**Unconstitutional Policies, Customs, and Practices**
**Resulting in a Violation of Constitutional Rights**
**(Against The City of Aurora)**

A.      **Unconstitutional Formal Policy**

84.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

85.     Aurora's own Independent Report states that one of the main causes of the excessive use of force by APD is the use-of-force policy itself, which is materially contrary to the constitutional holdings of the United States Supreme Court and the Tenth Circuit.

86.     Specifically, the use-of-force policy on October 10, 2019, allowed APD officers, including Officer Ord, to use subjective beliefs about the reasonableness of their use of force: "Members will only use reasonable and appropriate force; and only when legally justified." APD Directive 5.03, Section 5.3. The policy continues that an officer must have "reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or receiving great bodily injury." APD Directive 5.03, Section 5.3.1.

87.     However, the law, as enunciated quite clearly in *Graham v. Connor*, is that "the reasonableness inquiry…is an objective one: the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them." 490 U.S. 386, 397 (1989).

88.     Aurora's use-of-force policy is constitutionally deficient because it allows officers to use subjective reasonableness as a standard for applying whatever level of force he or she deems appropriate, including deadly force, as Officer Ord did on October 10, 2019.

89.     Creating a danger by sneaking onto someone's property in the dead of night, and then shooting them from outside of their home for nothing more than arming themselves in defense

of their home and family is objectively unreasonable by any standard. Clearly, Aurora's policy that allowed Officer Ord to rely on his *subjective* reasonableness created a dangerous situation that ultimately led to the violation of Plaintiff's constitutional rights.

### B. Failure to Properly Train

90.     To hold a municipality or municipal officer acting in his official capacity liable under §1983 for inadequate training, plaintiff must satisfy a four-part test by showing that: (1) officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on part of city or city official towards persons with whom the police officers come in contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Huff v. Reeves*, 996 F.3d 1082, 1092 (10th Cir. 2021).

91.     Here, Officer Ord's actions are clearly excessive and unconstitutional and are a direct result of the APD's failure to adequately train its officers, specifically including Officer Ord, on appropriate and constitutional use of force, including de-escalation, and its failure to provide any training whatsoever regarding officers interacting with lawfully armed homeowners.

92.     The specific circumstance under which this situation arose is that of police officer encounters with homeowners exercising their Second Amendment right to protect their homes and family. This is a usual and recurring situation with which Aurora police officers must deal.

93.     For example, on July 30, 2018, officers of the APD shot and killed Richard "Gary" Black, a 73-year-old Vietnam Army Veteran in his house as he was defending himself, his grandson, and his property against an intruder who had broken into his house and tried to murder his grandson.  When Aurora police officers arrived on scene, they shot and killed Mr. Black in his

living room, simply because he was holding a firearm. No officers made any attempt to defuse or de-escalate the encounter, and the officers shot Mr. Black within seconds of arriving. No officer was disciplined for this shooting. Instead, Aurora Police Chief Metz commended the officer who killed Mr. Black for running toward Mr. Black instead of away from him. Chief Metz stated that the officer acted in conformity with Aurora's policies.

94.     Not only does Aurora have absolutely no training on encounters with homeowners exercising Second Amendments rights, but it has also almost zero training on de-escalation in general, and deficient training on proportional constitutional use of force as set forth in both the AG's Report and the Independent Report.

95.     In fact, in light of the lack of training, the only guidance that Aurora officers have are the disciplinary decisions made in previous cases by the APD's Chief of Police and the Civil Service Commission – especially in high profile cases.

96.     Aurora very publicly failed to discipline the officer who shot Mr. Black in his living room despite the clear constitutional violation. As a direct result, one year later, when Officer Ord was faced with a very similar situation, he predictably acted in conformity with the disciplinary precedent made in the Black case.

97.     If Aurora had trained its officers in any meaningful way on de-escalation, specifically including how to handle encounters with homeowners exercising Second Amendment rights in the wake of the shooting of Richard Black, Mr. Huff would not have been shot on October 10, 2019.

98.     If Aurora had trained its officers to use proportional and constitutionally minimal standards, Mr. Huff would not have been shot on October 10, 2019.

C.       **Informal Custom Amounting to Widespread Practice**

99.     The APD has a custom of using excessive force in excess of constitutional limits.

100.    This custom of using excessive force is so persistent and widespread that it constitutes the standard operational procedure and de facto policy of the APD.

101.    According to the AG's Report, which is based on a systemic study of statistical evidence as well as actual observed cases, Aurora's pattern and practice of excessive force is based on "systemic and severe culture problems created by several factors":

a.  The Aurora Police culture leads to frequent use of force, often in excess of what the law permits;

b.  Aurora Police does not meaningfully review officers' use of force, relying on formal and informal systems that favor officers; and

c.  Aurora's disciplinary system is structured in such a way that officers who violate the law and policy are allowed to continue their employment by APD.

AG's Report, p. 2.

102.    This custom of excessive force "arises out of a perceived need to immediately take control of situations and establish dominance in interactions with members of the community." AG's Report, p. 80. Officers consistently "focus on control and submission when engaging with individuals." *Id.*

103.    The Attorney General's office conducted extensive observations of the APD and found that Aurora officers "were often quick to escalate and use dangerous and unnecessary tactics that led to unnecessary force. Aurora needs to change its approach to civilian encounters by using force as a last resort, not as the immediate option." AG Report, pp. 84-85.

104.    Recent examples of this custom, practice, policy, and culture within the APD

include the following:

a.   The circumstances of the killing of Richard "Gary" Black on July 30, 2018, as previously alleged.

b.   On August 2, 2020, APD officers held at gunpoint a van full of juveniles along with their guardian, Brittney Gilliam, on the suspicion that the van they were in had been stolen. The officers, without investigating properly, forced everyone out of the van, placed all but the youngest juvenile in handcuffs, and held them face-down on the ground at gunpoint. Not only was the van not stolen, but also the vehicle they were looking for was an out-of-state motorcycle. The Aurora officers did not have probable cause to stop this vehicle nor to draw their weapons on the adults and children inside the van. Nevertheless, no officers have been disciplined for this incident.

c.   On August 24, 2019, the APD received a call regarding a suspicious person walking down the street. APD officers stopped this person, Elijah McClain, used excessive force to detain him, and eventually killed Mr. McClain. A recent independent investigation into Mr. McClain's death by the APD revealed that the officers did not have probable cause to stop Mr. McClain in the first place.  Moreover, they continued their assault, eventually killing him, simply because he kept asking, "why are you doing this?" No officers have been disciplined for this incident.

d.   On November 21, 2018, Jamie Alberto Torres was told to exit his garage by an APD officer responding to a call of a noise complaint. Mr. Torres hesitated at the illegal order, so the Aurora police officer grabbed Mr. Torres, slammed him to the ground with his hands behind his back, and continued to attack him after putting handcuffs on him. To cover up the excessive force, Mr. Torres was charged with resisting arrest and

obstructing an officer; he was found not guilty by a jury. Mr. Torres filed a lawsuit against the City of Aurora, and it was settled for $285,000 in 2020. No APD officers were disciplined as a result of this incident.

105.     The Report also found that the disciplinary structure in Aurora fails to meaningfully correct officer misconduct. Specifically, the Force Review Board consistently focuses on justification of force, not its lawful and appropriate application, resulting in official exoneration of bad and illegal conduct. And the Civil Service Commission, which is ultimately in charge of discipline, frequently reverses meaningful disciplinary decisions, so that officers who violate the law and policy remain on the police force.  AG's Report, pp. 2, 82.

### D.     Final Policymakers' Ratification of Decisions

106.     The Chief of Police of the APD as well as Aurora's Civil Service Commission, have decision and policymaking power and, as such, are the final policymakers for Aurora's use-of-force policy.

107.     The Aurora Chief of Police and the Civil Service Commission have repeatedly ratified the policy, custom, practice, and/or culture of disproportionate and excessive force coupled with the failure to use de-escalation tactics during encounters with citizens, particularly while at or in their homes.

   a.   For an on-point example, former Police Chief for the APD, Nick Metz, publicly stated that the officers who shot and killed Richard Black in his home did nothing wrong. Furthermore, Police Chief Metz claimed the officers were justified even though the officers did not use objectively proportionate force or engage in any de-escalation tactics or strategies when they shot Mr. Black while he was lawfully defending his home and family and not pointing any weapon at any officer. The Police Chief's

statement illustrates the City's continued policy or custom of ratifying its officers' repeated use of excessive force and lack of any de-escalation strategies and tactics. Furthermore, none of the officers involved in shooting Mr. Black were disciplined. As stated by Chief Metz, he carefully reviewed all of the evidence many times, and after thorough analysis, he determined that the actions of the Aurora officer who shot Mr. Black conformed with Aurora policy.

b. Also, interim Aurora Police Chief, Paul O'Keefe, publicly stated that the officers involved in shooting Plaintiff including Officer Ord, acted in compliance with the APD's policies and that Officer Ord did nothing wrong when he shot Plaintiff. Similar to Chief Metz, Chief O'Keefe carefully reviewed and analyzed Officer Ord's decision to shoot Plaintiff and adopted it as Aurora policy. Police Chief O'Keefe further ratified the officers' failure to identify themselves, failure to use proportionate force, and failure to even attempt to use appropriate de-escalation strategies and tactics. Again, none of the officers, including Officer Ord, were disciplined for this unlawful use of excessive force.

108. The City's ratification of this policy, custom, practice and/or culture of disproportionate, excessive force, as well as failing to use de-escalation tactics during encounters with citizens while in their homes, directly displays an on-going deliberate indifference to the constitutional violations and injuries caused by APD officers' unconstitutional conduct.

**E.     The Moving Force Behind the Constitutional Violations**

109. If the City had a formal use-of-force policy that constrained its officers' use of force to objective standards with proportionality and de-escalation requirements, Officer Ord would have known that the situation and circumstances he confronted at Plaintiff's Home on October 10,

2019, did not warrant the use of deadly force.

110.    If the City had trained its officers on de-escalation tactics and strategies to use both before and during an encounter to decrease the need for and/or level of force, if it trained its officers on how to handle situations involving citizens who are trying to defend themselves and their homes during emergencies, and if it trained its officers on proportionality and objective standards for force, Officer Ord would have known what to do to de-escalate and defuse the situation and how to avoid the need for using any force, much less deadly force.

111.    If the City properly disciplined its officers for unlawful and unconstitutional conduct instead of excusing or exonerating them and ratifying their wrongful conduct, then Officer Ord would have had an incentive to handle the situation differently and more appropriately to avoid possible disciplinary action.

112.    Thus, the City's unconstitutional formal policy concerning its police officers' use of force, the City's failure to train its officers on proportionality of force and de-escalation, particularly in connection with citizens who lawfully exercise their Second Amendment rights in their homes, the City's customs and practices of failing to discipline its officers who commit constitutional violations, and the ratification of such conduct after-the-fact by the City's policymakers, were the moving force behind Officer Ord's use of excessive force that violated Plaintiff's constitutional rights and caused his injuries, damages, and losses.

113.    The previously alleged policy flaws, failure to train and discipline, ratification of illegal and unconstitutional conduct of its officers, and ongoing customs and practices that encourage rather than restrain officers' use of force demonstrate the City's deliberate indifference to the constitutional rights of its citizens and the people with whom its officers come into contact, specifically including the Plaintiff.

114.    As a direct and proximate result of the City's unconstitutional policies, practices, customs, failure to train and discipline, and ratification of the same, Plaintiff's constitutional rights were violated by being subjected to unnecessary and excessive force, and Plaintiff suffered injuries, damages, and losses as previously alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Andrew Glenn Huff, respectfully requests that this Court enter judgment in Plaintiff's favor on each of his respective claims and against the Defendants as follows:

a. Compensatory damages against both Defendants, jointly and severally, in an amount that will fully and fairly compensate the Plaintiff for his injuries, damages, and losses pursuant to 42 U.S.C. §1983;

b. Punitive damages against Defendant Officer Ord pursuant to federal law as punishment and deterrence against the commission of future such conduct;

c. Pre- and post-judgment interest;

d. Injunctive relief sufficient to prevent further Constitutional violations by the Defendants;

e. Reasonable attorney's fees, expert witness fees, and the cost of this action pursuant to 42 U.S.C. §1988 and any other applicable federal or state law.

f. Any other relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 7th day of October, 2021.

Respectfully submitted,
BAUMGARTNER LAW, L.L.C.

 *s/ S. Birk Baumgartner*
S. Birk Baumgartner
Daniel C. Mossinghoff
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (720) 626-9418
Fax: (720) 634-1018
birk@baumgartnerlaw.com
daniel@baumgartnerlaw.com


BEEM & ISLEY, P.C.

 *s/ Clifford L. Beem*
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 - 17th St., Ste. 850
Denver, CO 80202
Phone: (303) 894-8100
Fax: (303) 894-8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net


Plaintiff's Address:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113