IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02715-RMR-NRN

ANDREW GLENN HUFF, an individual,

Plaintiff,

v.

THE CITY OF AURORA, COLORADO;
OFFICER ALEXANDER ORD, in his individual capacity,

Defendants.

---

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT AND JURY DEMAND (Dkt. ##39 & 41)**

---

**N. REID NEUREITER
United States Magistrate Judge**

This 42 U.S.C. § 1983 case is before the Court pursuant to Orders (Dkt. ##40 & 42) issued by Judge Regina M. Rodriguez referring Defendants Alexander Ord ("Officer Ord") in his individual capacity and the City of Aurora's ("the City" and, collectively, "Defendants") Motions to Dismiss Plaintiff's Amended Complaint and Jury Demand. (Dkt. ##39 & 41.) Plaintiff Andrew Glenn Huff filed responses (Dkt. ##48 & 49), and Defendants filed replies. (Dkt. ##50 & 51.) On May 18, 2022, the Court heard argument on the subject motions. (*See* Dkt. #53.) The Court has taken judicial notice of the Court's file and considered the applicable Federal Rules of Civil Procedure and case law. Now, being fully informed and for the reasons discussed below, it is

**RECOMMENDED** that the subject motions be **DENIED** as follows.

# BACKGROUND[1]

### I. The October 10, 2019 Incident

This lawsuit arises from an incident that occurred on October 10, 2019 at the Aurora home Mr. Huff shared with his wife, young daughter, and brother, George. (Dkt. #36 ¶ 6.) That day, a man named George Bejar-Gutierrez, whom the brothers allowed to stay at the residence, stole George Huff's vehicle to drive to a methadone clinic. (*Id.* ¶¶ 7–8.) When Mr. Bejar-Gutierrez eventually returned, he was under the influence of methadone and George Huff's car was damaged. (*Id.* ¶ 9.) A confrontation, initiated by Mr. Bejar-Gutierrez, ensued, which prompted a passerby to call 911. (*Id.* ¶¶ 9–10.) Officers Doorgeest, VanDyk, and Vaughan of the Aurora Police Department ("APD") were dispatched to the scene, where they met with the Huff brothers, who explained what had happened. (*Id.* ¶¶ 13–14.) The officers informed the brothers that neither would be charged with any crime, and Andrew Huff gave them his cell phone number for any future communications. (*Id.* ¶¶ 14–15.)

Mr. Bejar-Gutierrez, who had fled before officers arrived and then proceeded to threaten the Huff brothers throughout that day and into the evening, eventually placed his own call to the APD, and met with Officers Ord, Marrero, and Oviatt at around 7:00 p.m. at a different Aurora residence. (*Id.* ¶¶ 11, 16–17, 19.) Mr. Bejar-Gutierrez told these officers that the Huff brothers assaulted him and that Andrew Huff had a firearm.

---

[1] Unless otherwise noted, all allegations are taken from Mr. Huff's Amended Complaint and Jury Demand ("Amended Complaint") (Dkt. #36) and are presumed to be true for the purposes of this motion to dismiss. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

(*Id.* ¶ 20.) Mr. Huff alleges that Mr. Bejar-Gutierrez was a convicted felon who had previously been arrested for giving false information to the APD. (*Id.* ¶ 22.)

At 11:30 p.m., Officers Ord, Marrero, and Oviatt, without any advance notice to Mr. Huff, went to Mr. Huff's home. (*Id.* ¶ 24.) They parked around the corner and, wearing all black clothing, proceeded to "creep" through neighboring yards towards Mr. Huff's residence. (*Id.* ¶¶ 26–27.) When Mr. Huff, who was smoking outside, saw these unidentified individuals advancing upon his home, he believed that Mr. Bejar-Gutierrez was following through on his earlier threats. (*Id.* ¶¶ 28–30.) He ran inside and retrieved a shotgun. (*Id.* ¶¶ 31, 34.) The officers took up positions around the front of Mr. Huff's home and Officer Marrero knocked on his door. (*Id.* ¶¶ 33, 35.) Mr. Huff, backlit by the light of the living room, looked through the window at the yard to see who was there, as the officers still had not identified themselves. (*Id.* ¶¶ 29, 32, 35–36.) He was facing the window with both hands by his side. His left hand held the shotgun by the barrel—his finger was not on the trigger and the gun was pointed at the ceiling. (*Id.* ¶ 37.) About 30 feet away, Officer Ord drew his weapon and, as he yelled, "Put your hands up, put your hands up!", fired five shots at Mr. Huff. (*Id.* ¶ 38–39, 49.) Mr. Huff, who was diving away from the window as Officer Ord opened fire, was shot in rectum and severely injured. (*Id.* ¶ 43.) Another round entered the room where his daughter lay sleeping. (*Id.*)

Officer Ord attempted to justify his actions by exclaiming that Mr. Huff "came into the window with a gun," and afterwards stated, "They are racking up in the garage," when, in fact, Mr. Huff, bleeding profusely on the floor, was merely calling 911 for help. (*Id.* ¶¶ 45–46.) Mr. Huff was charged with multiple felonies, all of which were ultimately dismissed. (*Id.* ¶¶ 55, 57.)

**II. Municipal Liability Allegations Against the City**

In his Amended Complaint, Mr. Huff references and incorporates an independent report titled "Recommendations for the Aurora Police Department" (the "Independent Report"), which was commissioned by the City and introduced as part of the City of Aurora Council Agenda Commentary on August 16, 2021. (*See* Dkt. #36-1.) He also cites a 118-page report released on September 15, 2021 by the Office of the Attorney General of the State of Colorado entitled, "Investigation of the Aurora Police Department and the Aurora Fire Rescue" (the "AG's Report"). (*See* Dkt. #36-2.) The Court will address these reports in more detail below, but notes generally that Mr. Huff alleges that "Officer Ord acted in conformity with the APD's flawed and inadequate policy, his lack of training, and the pervasive and widespread culture within the APD of using excessive force as a primary method of interacting with members of the Aurora community." (Dkt. #36 ¶ 74.)

**III. Claims for Relief**

Mr. Huff brings two claims for relief. The first is a Fourth Amendment excessive force claim asserted against Officer Ord in his individual capacity. (*Id.* ¶¶ 78–95.) The second is a claim for municipal liability brought against the City for its allegedly unconstitutional policies, practices, and customs. (*Id.* ¶¶ 96–140.)

**IV. Motions to Dismiss**

Both Defendants have now moved to dismiss. Officer Ord argues that he is entitled to qualified immunity. He contends that the Amended Complaint does not state a claim for excessive force because his actions were objectively reasonable under the circumstances, and he did not violate any clearly established law. (*See generally* Dkt.

#41.) The City argues that it cannot be liable because there was no underlying constitutional violation and, in any event, the Amended Complaint does not allege enough facts to support a claim for municipal liability. (*See generally* Dkt. #39.)

## LEGAL STANDARDS

### I. Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679–81. Second, the Court considers the factual allegations "to determine if they

plausibly suggest an entitlement to relief." *Id.* at 681. If the factual allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

## II. Section 1983 and Qualified Immunity

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quotations omitted).

In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). The doctrine of qualified immunity protects government officials from individual liability

in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory right*s. Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a right, and (2) the right was clearly established. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "In their discretion, courts are free to decide which prong to address first in light of the circumstances of the particular case at hand." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quotation omitted).

A qualified immunity defense may be asserted in a Rule 12(b)(6) motion, although a motion for summary judgment under Rule 56 is the more common vehicle for asserting such defenses. *See Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004). In asserting a qualified immunity defense in their Rule 12(b)(6) motion, Defendant Ord has set a higher bar for himself; "a district court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Jensen*, 371 F.3d at 1202 (internal quotations and citations omitted). In sum, asserting a defense of qualified immunity shifts the burden to the plaintiff, but doing so in the context of a Rule 12(b)(6) motion materially lessens that burden.

## ANALYSIS

## I. Fourth Amendment Excessive Force Claim Against Officer Ord

### a. The Constitutional Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show both that a seizure occurred and that the seizure was unreasonable." *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (internal quotation marks omitted). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also McWilliams v. Dinapoli*, 40 F.4th 1118, 1124 (10th Cir. 2022) ("The Fourth Amendment prohibits the use of excessive force when making an arrest."). In assessing an excessive force claim under the Fourth Amendment, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). The inquiry "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. In conducting this analysis, the Court must "consider the factors the Supreme Court clearly set forth in *Graham v. Connor.*" *McCowan v. Morales*, 945 F.3d 1276, 1283 (10th Cir. 2019). These three factors are "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) (alteration in original) (quoting *Graham*, 490 U.S. at 396).

i**. The First *Graham* Factor**

The first *Graham* factor, "the severity of the crime at issue," 490 U.S. at 396, is inconclusive at this stage.

Understandably enough, the Amended Complaint does not state what Mr. Bejar-Gutierrez told officers when he met with them on the evening of October 10, 2019, beyond, "George Bejar-Gutierrez claimed that the Huff brothers had assaulted him earlier in the day and claimed that Plaintiff had a firearm." (Dkt. #36 ¶ 21.) It is unknown whether Mr. Bejar-Gutierrez described a felonious assault, i.e., that he suffered serious bodily injury at the hands of the Huff brothers or that a deadly weapon was used. *See* Colo. Rev. Stat. §§ 18-3-202, 18-3-203. Unhelpfully, in his motion, Officer Ord argues that he and the other officers were investigating Mr. Huff for assault, "which *could have been considered a felony* in the state of Colorado." (Dkt. #41 at 8 (emphasis added) (citing Colo. Rev. Stat. 18-3-202).) Officer Ord is more definitive in his reply; he says that Mr. Bejar-Gutierrez reported a "felony assault." (Dkt. #51 at 3.) This incongruity is left unexplained, but it can and should be explored in discovery.[2]

What Mr. Huff does allege, and what the Court must accept as true, is that the officers waited four hours after the alleged assault was reported to attempt to contact Mr. Huff. Officer Ord suggests that it is reasonable for police to take the time and prepare for a safe approach of an armed suspect. While the Court does not discount this argument, the delay could equally imply that the officers did not believe that exigent circumstances existed such that their later actions—waiting until almost midnight; parking around the corner; "sneaking" through the neighbors' yards; silently taking positions around the front of the house; all while not identifying themselves—were

---

[2] In his reply, Officer Ord argues that Mr. Huff could also have been suspected of felony menacing. (Dkt. #51 at 4.) This argument is not contained in his motion, and the "general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)

justified. Moreover, what "preparations" the officers were taking during this time is relevant. Did they check the criminal records of the parties? Did they check whether Mr. Huff's firearm was registered? Did they bother to inquire whether there were prior reports from the parties that had previously been investigated by other officers the same day? Did they see that the brothers had been cleared of wrongdoing by their fellow officers? These are issues to be developed during discovery.

In short, the first *Graham* factor, at this early stage, does not weigh in favor of either party.

### ii. The Second *Graham* Factor

The second *Graham* factor, "whether the suspect pose[ed] an immediate threat to the safety of the officers or others," 490 U.S. at 396, "is the 'most important' and *fact intensive* factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (emphasis added) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

"A frequent concern of the courts is the use of deadly force—that is, 'force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm.'" *St. George v. City of Lakewood, Colo.*, No. 20-1259, 2021 WL 3700918, at *5 (10th Cir. Aug. 20, 2021) (unpublished) (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 n.2 (10th Cir. 2004)). The Tenth Circuit has set forth four nonexclusive factors to consider when assessing the seriousness of a threat that precipitated an officer's use of deadly force: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the

distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Although these factors are significant, they are only aids in making the ultimate determination of whether the totality of circumstances justifies the use of deadly force from the perspective of a reasonable officer. *See Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020). The four *Larsen* factors guide the assessment of the second *Graham* factor. *See Estate of Larsen*, 511 F.3d at 1260.

The first *Larsen* factor goes to "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands." *Id.* Mr. Huff alleges that the officers did not identify themselves at any time prior to the shooting and that Officer Ord fired his weapon *at the same time* as he shouted, "Hands up!" "The Supreme Court has said that 'deadly force may be used if necessary to prevent escape [of one who threatens an officer with a weapon], and *if, where feasible, some warning has been given.*'" *St. George*, 2021 WL 3700918, at *6 (alterations and emphasis in original) (quoting *Garner*, 471 U.S. at 11–12). Taking the allegations of the Amended Complaint as true, Mr. Huff was never informed that he was dealing with police officers, much less that deadly forced might be used. Given that "the failure to warn when feasible and without excuse is so fundamental that it is often dispositive," *id.*, this factor weighs in favor of Mr. Huff.

The second *Larsen* asks "whether any hostile motions were made with the weapon towards the officers," 511 F.3d at 1260, and likewise weighs in favor of Mr. Huff. According to the Amended Complaint, Mr. Huff did not point his weapon at anyone; he held the shotgun by its barrel and it was pointed at the ceiling. Nor did he

ever fire the weapon. Officer Ord argues that "Plaintiff's appearance at the front window with a shotgun in his hand was, by itself, hostile in nature." (Dkt. #51 at 7.) But given that there is no "per se rule of objective reasonableness where a person *points a gun at a police officer*," *Pauly*, 874 F.3d at 1217 (emphasis added), the mere possession of a weapon does not, by itself, justify the use of deadly force. *See St. George*, 2021 WL 3700918, at *7 (the plaintiff's "carrying a gun in the low-ready position to protect himself as he walked around his house late at night to see who it was that wanted him to come outside and talk was not a hostile or threatening action" where police officers had failed to identify themselves). Possession of a firearm in one's home is also a constitutionally protected right and is not unlawful absent some disqualifying characteristic, such as being a felon. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (" There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

The third *Larsen* factor, "the distance separating the officers and the suspect," 511 F.3d at 1260, supports Officer Ord. Though Officer Ord allegedly fired from some 30 feet away, Mr. Huff was apparently much closer to the officer knocking on the door, which intensifies the immediacy of danger, although the exact layout the property is unknown at this time.

The fourth *Larsen* factor, "the manifest intentions of the suspect," 511 F.3d at 1260, weighs in favor of Mr. Huff. Under the circumstances described in the Amended Complaint, Mr. Huff's "manifest intentions" were not to harm officers but to protect himself and his family from someone who had physically confronted him earlier that day and then made threats return to the property. Mr. Huff had no reason to believe he

would be contacted by police officers given his earlier cooperation. And Officer Ord and his fellow officers' failure to identify themselves and their "covert" approach to the home served to reinforce Mr. Huff's belief that he was in danger. Under this version of events, "it was no surprise" that Mr. Huff armed himself "because it was [his] constitutional right to do so." *Pauly*, 874 F.3d at 1197.

On balance, then, the *Larsen* factors, and thus the second *Graham* factor, weigh heavily in favor of Mr. Huff at the motion to dismiss stage. The Amended Complaint plausibly alleges that it was unreasonable for Officer Ord to believe that Mr. Huff posed a grave threat of danger to himself or anyone else. Officer Ord is free to raise this "fact intensive" issue again on summary judgment, after discovery.

### ii. The Third *Graham* Factor

The third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, weighs of favor of Mr. Huff. According to Mr. Huff, he had fully cooperated with APD officers that very day, going so far as to give them his cell phone number in case they had follow up questions. When Officer Ord and the other officers arrived at Mr. Huff's house, they did not tell Mr. Huff that they were police officers or that Mr. Huff was being arrested. Mr. Huff "couldn't have been resisting an arrest if he hadn't even been told that he was being arrested." *McWilliams v. Dinapoli*, 40 F.4th 1118, 1127 (10th Cir. 2022); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) (concluding that this factor supported the plaintiff because he had been grabbed and tackled without being told that he was under arrest). As alleged, this factor supports Mr. Huff.

Upon careful review of the *Graham* and *Larsen* factors, the Court finds that Mr. Huff has plausibly alleged that Officer Ord violated his Fourth Amendment right to be free from excessive force. The Court will next address whether that right was clearly established.

### b. Clearly Established Law

"For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011). *See also McCowan*, 945 F.3d 1285–86 ("A right is clearly established when a reasonable officer would have recognized the unconstitutionality of the conduct based on existing precedent."). Because claims of excessive force turn on the facts surrounding an officer's use of force, the Court must specifically define the clearly established right. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "[T]he dispositive question is whether the violative nature of *particular* conduct is clearly established and the inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Pauly*, 874 F.3d at 1222 (emphasis in original) (alterations and internal quotations omitted). But a right may be clearly established even without "a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate.'" *McCowan*, 945 F.3d at 1285 (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

The Court agrees with Mr. Huff that the Tenth Circuit's opinion in *Pauly v. White* put Officer Ord on notice that shooting into Mr. Huff's and hitting Mr. Huff violated the Constitution. In *Pauly*, Samuel Pauly was shot through the window of his home by

Officer White, a state police officer who was investigating an earlier road rage incident involving Samuel's brother, Daniel Pauly. 874 F.3d at 1202. Three officers, including Officer White, arrived at the house after 11:00 p.m. in the month of October. *Id.* at 1203–04. The officers approached and surrounded the residence without activating their security lights, which "confused and terrified" the brothers, who feared they could be intruders related to Daniel's prior road rage altercation. *Id.* at 1204. The officers told the brothers to come outside but did not clearly identify themselves. *Id.* Samuel armed himself with a loaded handgun and gave Daniel a shotgun and ammunition. *Id.* at 1205. One of the brothers shouted, "We have guns," and Daniel fired two warning shots out of the back door. *Id.* Samuel opened the front window and pointed a handgun at Officer White, who then fired from behind a stone wall 50 feet away. *Id.*

The Tenth Circuit determined that, viewing the evidence in the light most favorable to the plaintiffs,[3] Officer White's use of deadly force was not objectively reasonable. The court stated that the first and third *Graham* factors favored the plaintiffs, noting that while it was unclear what crime was at issue, the officers did not believe exigent circumstances existed, and they were not at the residence to make an arrest because there was no probable cause to do so. *Id.* at 1215, 1222.

Using the four-part *Larsen* test, the court also concluded that the second *Graham* factor did not weigh conclusively in favor of Officer White. *Id.* at 1221. The first part of the *Larsen* test favored the plaintiffs because "Officer White did not identify himself or order Samuel Pauly to drop his weapon." *Id.* at 1216. The second part weighed in favor

---

[3] The case was before the court on an interlocutory appeal from the district court's denial of the officers' motion for summary judgment.

of Officer White because Samuel Pauly pointed a handgun at him or "at least in in his direction." *Id.* at 1216–17. The third and fourth *Larsen* factors weighed in favor of the plaintiffs given Officer White's distance from Samuel Pauly and Pauly brothers' constitutional interest in protecting themselves and their home. *Id.* at 1218–19. Finally, the Court stated that "alleged reckless actions of all three officers were so immediately connected to the Pauly brothers arming themselves that such conduct should be included in the reasonableness inquiry." *Id.* at 1221.

The contours of *Pauly* are sufficiently similar to those at issue in this case to conclude that Officer Ord violated clearly established law. Both incidents took place on a fall night after 11:00 p.m. Both involved officers who did not adequately identify themselves to individuals who had no reason to believe that they would be contacted by the police. In both, a law enforcement officer standing outside a home shot an armed man standing behind a well-lit window inside the home. Insofar as the cases are materially different, the differences only bolster Mr. Huff's argument. In *Pauly*, evidence indicated that the man who was shot *pointed* a gun at an officer. Moreover, warning shots were fired from the rear of the residence before Officer White opened fire. In contrast, Mr. Huff was holding his shotgun, which was pointed at the ceiling, by the barrel; his finger was not on the trigger and he did not fire the weapon.

Officer Ord argues that *Pauly* is distinguishable in several ways, the most important distinction being that he gave Mr. Huff a warning to put his hands up. However, as noted above, the Amended Complaint alleges that the warning came *as* Officer Ord started shooting. If true, this effectively means that no warning was given at all.

16

Officer Ord also points out that "the plaintiffs in *Pauly* did not flee approaching officers." But, like the Pauly brothers, Mr. Huff did not know, and had no reason to know, that the people approaching his house were law enforcement officers. Instead, both Mr. Huff and the Pauly brothers feared intruders, and Mr. Huff's fear was rational given the threats he received from Mr. Bejar-Gutierrez earlier that day.

Officer Ord also states the *Pauly* shooting occurred in a rural, rather than urban, setting, and the "confrontation between the brothers and officers lasted for a "significant amount of time" before Samuel Pauly was shot. Neither argument is persuasive. It appears that only 3-4 minutes had elapsed from the time that Officer White arrived at the Pauly residence and the final shot was fired. *See* 874 F.3d at 1212–13. This is hardly a "significant amount of time," especially considering that the Court has nothing to compare it to here, temporally speaking; the Amended Complaint only alleges that "Officer Ord started shooting at Plaintiff approximately two seconds after seeing him standing non-threateningly in his window." (Dkt. #36 ¶ 42.) Moreover, whether urban or rural, both cases involved individuals who were shot while standing back-lit in their front windows.

The Court recognizes that the facts of the two cases are not precisely the same, but "there will almost never be a previously published opinion involving exactly the same circumstances." *Casey*, 509 F.3d at 1284. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This case does not involve novel factual circumstances, however. Instead, like *Pauly*, it involves an individual who was shot inside his home by a police officer who had not identified himself and who had no probable cause to believe

17

that there was threat of serious physical harm to himself or others. A consideration of *Graham*, *Larsen*, and *Pauly* demonstrates this conduct violates a clearly established law.

Accordingly, the Court recommends that Officer Ord's Motion to Dismiss be denied.

### III. Municipal Liability Claim

The City argues that Mr. Huff's municipal liability claim should be dismissed because: (1) there was no underlying constitutional violation by Officer Ord; (2) the AG and Independent Reports do not establish municipal liability; and (3) the Amended Complaint does not allege sufficient facts to support such a claim. The first argument fails for the reasons detailed above. The Court will address the two remaining arguments together.

The Supreme Court held in *Monell v. Department of Social Services* that "person," as used in § 1983, includes "municipalities and other local government units" 436 U.S. 658, 691 (1978). To state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron*, 392 F.3d at 419. A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so

long as that failure results from "deliberate indifference" to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted). But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Mr. Huff's municipal liability claim is premised on: (1) the City's unconstitutional use-of-force policy; (2) the failure to train; (3) an informal custom of excessive force amounting to a widespread practice; and (4) a final policymakers' ratification. As explained more fully below, the Court finds that while Mr. Huff cannot maintain a municipal liability claim based on the first and third theories, he has sufficiently alleged that the City failed to train Officer Ord in the use of appropriate force when confronted with individuals exercising their Second Amendment right to keep bear arms in their homes, and that the City's final policymakers ratified Officer Ord's allegedly unconstitutional use of deadly force. Therefore, the Court recommends that the City's Motion to Dismiss be denied.

### a. Formal Policy

Mr. Huff alleges that the APD's use-of-force policy is constitutionally deficient. Per the Amended Complaint, APD policy states: "Members will only use reasonable and appropriate force; and only when legally justified," and further provides that an officer must have "reasonable ground to believe, and does believe, that he or another person

is in imminent danger of being killed or receiving great bodily injury." (Dkt. #36 ¶ 98.) According to Mr. Huff, the policy only references the officer's subjective reasonableness, while under the Constitution, the standard is whether an officer's actions are objectively reasonable. Mr. Huff also objects because the policy does not reference the proportionality factors set forth in *Graham.* Other deficiencies identified by Mr. Huff include the lack of any policies regarding: (1) shooting into residences; (2) investigating prior communications with suspects and other APD officers; and (3) de-escalating dangerous situations.

As to the written use-of-force policy, the Court agrees with the City that, as written, it encompasses both objective ("reasonable ground to believe") and subjective ("and does believe") reasonableness. Similarly, the policy limits the use of "reasonable and appropriate force" to situations where it is "legally justified." In other words, it requires a proportionality analysis. Above, the Court found that, for the purposes of Officer's Ord's motion to dismiss, Officer Ord, despite his subjective beliefs, *did not* have reasonable grounds to believe that he or any of his fellow officers were in imminent danger, and therefore the amount of force he used was not appropriate or legally justified. Put differently, the Court determined that he *violated* ADP policy. Logically, then, the policy cannot be said to be a "moving force" behind Mr. Huff's injury.

While the ADP's formal use-of-force policy could (and probably should) be more explicit and provide, for example, force matrices or continuums or specific objective factors affecting the reasonableness of the force to be used, the Court cannot say the policy is, on its face, constitutionally deficient.

With regards to the lack of formal policies regarding "shooting into a residence," "investigating prior communications with suspects," and de-escalation tactics, Mr. Huff essentially asked the Court to find the existence of an unconstitutional policy or custom in its absence. He points to no legal precedent that authorizes the Court to do so. To the Court, this reads like a different way of saying that the APD has an *informal* custom of using excessive force, shooting into residences, and escalating situations, or that it fails to properly train its officers on dealing with these situations. Indeed, Mr. Huff does make these arguments, and the Court will address them below.

That said, the Court finds that Mr. Huff does not state a claim against the City for unconstitutional formal policies.

### b. Failure to Train

The standards for pleading a municipal liability claim are stringent, particularly when the claim is based on a failure to train theory. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To state a *Monell* claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference" is an exacting standard of fault. *See Bryan Cnty.*, 520 U.S. 397, 410 (1997). It requires showing that a municipal actor disregarded a known or obvious consequence of his action. *Id.* "Thus, when city

policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. But "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62 (quotation omitted).

"Deliberate indifference" for purposes of failure to train or supervise ordinarily necessitates showing a pattern of similar constitutional violations by untrained employees. *See Bryan Cnty.*, 520 U.S. at 409 "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390–91.

Mr. Huff alleges that Officer Ord's "excessive and unconstitutional" actions were "a direct result of the APD's failure to adequately train its officers, specifically including Officer Ord, on appropriate and constitutional use of force, including avoiding unnecessary escalation, shooting into residences, and using proportionate force when encountering lawfully armed homeowners." (Dkt. #36 ¶ 109.) To establish a pattern of similar violations, he cites the AG's Report as showing "a consistent pattern of escalating encounters with civilians to the point that civilians and officers are

unnecessarily injured," and gives the example of the APD's tragic 2018 killing of Gary

Black,

> a 73-year-old Vietnam Army Veteran [who was killed] in his house as he was defending himself, his grandson, and his property against an intruder who had broken into his house and tried to murder his grandson. When Aurora police officers arrived on scene, they shot and killed Mr. Black in his living room, simply because he was holding a firearm. No officers made any attempt to defuse or de-escalate the encounter, and the officers shot Mr. Black within seconds of arriving. No officer was disciplined for this shooting. Instead, Aurora Police Chief Metz commended the officer who killed Mr. Black for running toward Mr. Black instead of away from him. Chief Metz stated that the officer acted in conformity with Aurora's policies.

(*Id.* ¶¶ 109–112.)

The Court finds that Mr. Huff's reliance on the AG's Report in the Amended

Complaint and the Independent Report in his response brief are misguided. The two

reports were issued in 2021. The incident at issue here occurred in October 2019. As

Judge William J. Martinez noted in *Marck v. The City of Aurora, et al.,* 21-cv-01071-

WJM-SKC (D. Colo.), which the City attached to its motion (*see* Dkt. #39-1), "2021

report[s are] irrelevant to the question of whether the City was aware of problems in its

training procedures in 2019." In any event, Mr. Huff does not point to any specific

incidents referenced in the reports that are substantially similar to case at bar, i.e.,

officers shooting a man in his own home without identifying themselves and giving

inadequate or no warning.

Moreover, whatever the similarities between this shooting and that of Mr. Black,

the Tenth Circuit has held that "[o]ne prior incident, even if it was a constitutional

violation sufficiently similar to put officials on notice of a problem, does not describe a

pattern of violations." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir.

2019); *see also Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make.").

But, the Supreme Court has not "foreclose[d] the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. "'[I]n a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Bryan Cnty.*, 520 U.S. at 409. For example, in *Canton,* the Court posed the hypothetical example of a city that gives its police force firearms and introduces them into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. 489 U.S. at 390 n.10.

> Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.

 *Connick*, 563 U.S. at 64 (quoting *Bryan Cnty.*, 520 U.S. at 409).

Mr. Huff alleges here that "[n]ot only does Aurora have absolutely no training on shooting into residences or encounters with homeowners exercising Second Amendments rights, but it has also almost zero training on avoiding unnecessary escalation, and deficient training on proportional constitutional use of force." If true, this demonstrates the APD's deliberate indifference to its citizens' constitutional rights, especially given how many American homeowners—exercising their well-established Second Amendment rights—legally own and possess firearms. Accordingly, at this early

stage, Mr. Huff's Amended Complaint plausibly states a claim against the City under a failure to train theory.

### c. Custom or Practice

To establish municipal liability on the basis of custom or practice, a plaintiff must show: (1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom and that the custom was the moving force behind the unconstitutional acts. *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993). "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).

The Amended Complaint cites the AG's Report's for the proposition that "the APD has a pattern and practice of using excessive force caused by a culture that emphasizes justification of force, rather than whether force was lawful and appropriate," and that "this custom of excessive use of force also includes 'a consistent pattern' of 'low levels of coordination' in which officers 'acted quickly when no need to do so was present and escalated the situation often resulting in injury to themselves and the individuals.'" (Dkt. # 36 ¶¶ 122–23.) Again, however, this report cannot serve as notice to APD officials of an unconstitutional custom or practice because it was published after

the October 10, 2019 shooting. Nor does Mr. Huff point to specific incidents described in the report where similarly situated individuals where mistreated in the same manner.

Mr. Huff also details four instances which he alleges show a pattern of tortious conduct on the part of the APD of using disproportionate and maximum force. However, the only incident that involves a similarly situated individual who was subject to similar mistreatment at the hands of the APD is the shooting of Mr. Black. None of the other three involve the use of a firearm. One instance is not enough to establish a widespread practice. *See Waller*, 932 F.3d at 1290 (10th Cir. 2019) (finding that allegations "describing only one similar incident . . . fall far short of plausibly alleging a 'widespread practice'").

### d. Ratification

"Ratification can be found when the employees were given authority for the action, subject to the review and approval of a final policymaker, and when the final policymaker approves of the decision and the basis for the decision." *Colbruno v. Diggins*, Case 17-cv-01072-DDD-NRN, 2018 WL 10215848, at *10 (D. Colo. 2018) (citing *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010)). Generally, the final decisionmakers' approval must precede the violative action; the Tenth Circuit has rejected ratification based on a failure to discipline after the violation has occurred. *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation.") (emphasis in original). A municipality will not be found liable under the ratification theory "unless a final

decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson*, 627 F.3d at 790.

Mr. Huff alleges that the APD Chief of Police and the City's Civil Service Commission are the final policymakers for Aurora's use-of-force policy. (Dkt. #36 ¶ 130.) He cites the APD's Directive Manual as stating, "The Chief of Police is the Chief Executive Officer of the Department and final departmental authority in all matters of policy, operations, and discipline." (*Id.* ¶ 131.) The Court finds that, at this stage, Mr. Huff has adequately alleged that the APD Chief of Police has final decision-making authority for disciplinary decisions. *See Vogt v. City of Hays, Kan.*, 844 F.3d 1235, 1252 (10th Cir. 2017). The question, then, is whether the APD Chief of Police's alleged ratification of Officer Ord's conduct is evidence of an unconstitutional municipal policy or practice.

According to Mr. Huff, APD Chief Paul O'Keefe publicly supported Officer Ord after the shooting, stating that Officer Ord complied with APD policy and did nothing wrong. (*Id.* ¶ 132(b).) Mr. Huff further notes that former APD Chief Nick Metz publicly backed the officers who shot and killed Mr. Black in 2018. (*Id.* ¶ 132(a).) No officers were disciplined in either case. Mr. Huff argues that this amounts to ratification and is evidence of the APD's unconstitutional policy of shooting at homeowners lawfully exercising their Second Amendment rights.

Under *Cordova,* Chief O'Keefe's failure to discipline Officer Ord after shooting Mr. Huff cannot, on its own, plausibly form the basis of municipal liability on a ratification theory. However, the court in *Cordova* went on to acknowledge that "[a] failure to investigate or reprimand might also cause a future violation by sending a message to

officers that such behavior is tolerated." 569 F.3d at 1194. That is what Mr. Huff alleges

here. He claims that after police shot and killed Mr. Black in his home, then-Chief Metz

publicly stated the officers did nothing wrong and none of them were disciplined. Then,

Chief O'Keefe, after "carefully review[ing] and analyz[ing] Officer Ord's decision to shoot

Plaintiff," under circumstances similar to those that resulted in Mr. Black's death,

likewise determined that the officer's actions were in line with APD policy. If the City's

final policymakers took affirmative steps to not merely condone but also commend the

allegedly excessive and unconstitutional use of deadly force by APD officers, this

deliberate conduct may be enough to establish the existence of an official informal

policy, whatever the formal written policy may provide. The Court agrees with Mr. Huff

that, at the pleading stage, he has adequately alleged municipal liability under a

ratification theory.

## **RECOMMENDATION**

It is hereby **RECOMMENDED** that Defendants' Motions to Dismiss Plaintiff's

Amended Complaint and Jury Demand (Dkt. ##39 & 41) be **DENIED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

**and file specific written objections to the above recommendation with the District**

**Judge assigned to the case. A party may respond to another party's objections**

**within fourteen (14) days after being served with a copy. The District Judge need**

**not consider frivolous, conclusive, or general objections. A party's failure to file**

**and serve such written, specific objections waives *de novo* review of the**

**recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53**

(1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

Dated:      September 12, 2022
            Denver, Colorado              _____
                                          N. Reid. Neureiter
                                          United States Magistrate Judge